# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

### CASE NO. 18-20783-CIV-ALTONAGA/GOODMAN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

FRANCISCO HERNANDEZ and
HUGO GIMENEZ,

     Defendants.

_____/

## <u>ORDER ON POTENTIAL ADVERSE INFERENCES</u>

    *"I'm really not up for answering any questions that start with how, when, where, why or what."*

-   John Green, author of the best-selling "The Fault in Our Stars" (1977 -  )

During an in-person evidentiary hearing on whether Defendants Francisco Hernandez and Hugo Gimenez should be held in contempt for violating the October 31, 2018 Injunction [ECF No. 44], Gimenez asserted the Fifth Amendment to all substantive questions about the facts underlying the requested contempt. The United States asks the

Court to reach a permissive adverse inference against *both* Gimenez and Hernandez, based on Gimenez's repeated invocation of the Fifth Amendment privilege. The Undersigned required briefing. [ECF No. 95]. Gimenez, Hernandez, and the United States (which submitted *two* briefs, one for each Defendant) all filed memoranda. [ECF Nos. 106; 105; 107; 108].

For the reasons outlined below, the Undersigned *will* apply an adverse inference against Gimenez but will *not* do so against Hernandez. The adverse inference against Gimenez will not by itself be sufficient to justify a recommendation of contempt for either Defendant, as the United States must have additional, independent evidence to meet its burden to establish a violation by clear and convincing evidence.

<u>Hernandez</u>[1]

In his memorandum, Hernandez asserted many points, both fact-based and legal-focused: (1) adverse inferences must comply with the evidentiary rules, which means they must be relevant; (2) an adverse inference against him because of Gimenez's Fifth Amendment assertion would be unavailable if Gimenez lacked personal knowledge of the matters at issue in the questions; (3) any adverse inferences must not be unfairly prejudicial, confusing, or cumulative; (4) an adverse inference cannot alone be the basis

---

[1]     Hernandez filed his memorandum first, a week before Gimenez filed his memorandum. As a result, the United States' first memorandum concerned Hernandez, and its second memorandum, filed a week later, concerned Gimenez. Therefore, based on the timing, the Undersigned will first discuss Hernandez.

for a contempt finding; (5) the Court may draw an adverse inference only if the Court can also identify independent evidence corroborating it; (6) the need to corroborate adverse inferences in contempt cases is particularly acute because contempt must be established by clear and convincing evidence; and (7) his counsel has not found any case in this Circuit approving of an adverse inference drawn against a **testifying** defendant from a non-testifying co-defendant. [ECF No. 105].

In addition to those arguments, Hernandez emphasized that: (8) the United States did not ask Gimenez any questions about Hernandez; (9) no questions asked of Gimenez had anything to do with the United States' allegations against Hernandez concerning his preparation of the Ackermans' tax return and his failure to supervise Gimenez; (10) an adverse inference against Hernandez would be unfairly prejudicial; (11) there is no record evidence concerning Gimenez's personal knowledge of Hernandez's compliance with the Injunction; (12) there is no corroborating evidence to support an adverse inference because Gimenez did not ask questions about his relationship with Hernandez but Hernandez testified that Gimenez is an independent contractor, owns no portion of the company, is not a company manager or supervisor and that the two do not control each other's work; (13) he and Gimenez have different roles in the contempt proceeding and their interests are not necessarily aligned; (14) Hernandez established that the Ackermans' tax return was in fact accurate, so the only evidence against him would be an adverse inference, which is improper; and (15) the Injunction provides that the actions

3

of Gimenez and Hernandez shell not be considered actions affecting the other if they "decide to prepare tax returns independently from one another" -- and the evidence showed that they do prepare returns independently from one another, which means an adverse inference against Hernandez would improperly expand the Injunction beyond its terms. *Id.*

The United States raised several points in response: (1) applying an adverse inference to Hernandez is trustworthy here; (2) the Injunction provides that Gimenez's actions may be held against Hernandez unless they prepare tax returns independently; (3) Defendants continued to prepare returns together at the tax preparation firm; (4) a strong bond of loyalty exists between the two; (5) Hernandez has significant control over Gimenez (and all his tax preparers); (6) their interests are aligned; and (7) they both played a controlling role in the underlying facts. [ECF No. 107].

The United States raised additional points, as well: (8) Gimenez's and Hernandez's careers as tax preparers are inextricably intertwined because of their long personal and professional relationship; (9) as owner of Francisco Hernandez Tax Services, LLC ("FHTS"), Hernandez could fire Gimenez; (10) Hernandez handled administrative tasks and business concerns for Gimenez, such as collecting fees from Gimenez's customers and paying Gimenez after deducting his own 60% fee first (even from customers whose returns he never prepared or reviewed); (11) given Hernandez's control over FHTS, there is a presumption that he knew that Gimenez's conduct violated the injunction; and (12)

Gimenez acted within the scope of his employment for Hernandez when he engaged in the activities at issue. *Id.*

Gimenez

Gimenez's memorandum raised several of the same points urged by Hernandez, so the Undersigned's summary of his positions will include only new points not raised by Hernandez: (1) no negative inference can be drawn unless there is a substantial need for the information and there is not another less-burdensome way of obtaining the information; (2) the only inference from his Fifth Amendment assertion is that his testimony would provide a link in the chain that could be used against him in a criminal case, which he says falls far short of suggesting liability for civil contempt here; (3) the United States itself created the need for Gimenez to invoke his Fifth Amendment privilege by "far overstating" its case in its motion to show cause by "leveling allegations of criminal conduct against him that are simply not true"; (4) the circumstances here are not merely civil litigation between private parties -- it is a suit and motion pushed by the Justice Department and a division (the Tax Division) which would be responsible for his criminal prosecution; (5) unlike a conventional civil litigant, the United States could have eliminated the basis for a Fifth Amendment assertion by immunizing Gimenez from criminal liability derived from his testimony, but it did not offer such immunity, so the need for Gimenez to invoke his privilege remained; and (6) an adverse inference based upon invocation of the Fifth Amendment privilege is not a punishment -- it should not

be used to an extent greater than needed to prevent unfair and unnecessary prejudice to the United States. [ECF No. 106].

Gimenez raised additional points in his submission; (7) not much that is relevant to the civil contempt issue can be inferred from Gimenez's Fifth Amendment assertions; (8) the clients whose returns are at issue all signed their returns under penalty of perjury, confirming their accuracy; (9) the witnesses received copies of their returns, with instructions to contact Gimenez about any questions or concerns; and (10) even if the Court were to draw an adverse inference against Gimenez, the only inference is that his testimony would have provided a link in the chain of evidence the United States would need to successfully prosecute him on a tax fraud theory. *Id.*

In response, the United States raised several arguments, some of which it also asserted in its response to Hernandez's memorandum. The Undersigned will list those new points which the United States did not also make in its response to Hernandez's memorandum, although the list here may in part overlap with some of the points made in the Hernandez scenario.

The United States focused on the following points: (1) a court should grant an adverse inference when the Fifth Amendment-based unavailability of a witness's testimony in a civil proceeding substantially prejudices the opposing party -- to ensure it treats the opposing party equitably; (2) Gimenez elected to invoke the Fifth Amendment only after the United States, in its reply memorandum, identified substantial problems

with the supporting documents he submitted to the Court with his opposition; (3) he cross-examined the Government's witnesses, and he therefore was not confronted with the dilemma of choosing between silence or putting on a defense; (4) Gimenez invoked his Fifth Amendment right to silence on the advice of counsel, who had the ability to advise him on the wisdom of not testifying at the evidentiary hearing; (5) the Government should not be faulted for not immunizing him because it had no indication that he would change course (from his decision to testify by submitting a declaration) and, from a practical perspective, the United States' ability to offer him immunity was constrained at the hearing by the last minute choice to suddenly invoke his Fifth Amendment right to silence. [ECF No. 108].

**<u>The Ruling</u>**

<u>Hernandez</u>

The Undersigned will *not* draw an adverse inference against Hernandez based on Gimenez's assertion of the Fifth Amendment during the evidentiary hearing. The Undersigned recognizes that I may well have the discretion and legal authority to draw an adverse inference, but I am exercising that discretion here by *rejecting* the United States' request to invoke the inference against a defendant who **fully testified at the hearing**.

At bottom, the Undersigned finds, under a Federal Rule of Evidence analysis, that the requested inference would be unfairly prejudicial to Hernandez. *United States ex rel.*

*DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 634 (E.D. Vir. 2006) ("any adverse inferences must be relevant, reliable, and not unfairly prejudicial, confusing, or cumulative").

The United States' direct allegations against Hernandez concern his preparation of the Ackermans' 2021 tax return. But it asked no questions of Gimenez about that return. Moreover, the United States' other allegation against Hernandez (that he failed to supervise Gimenez) was also not a subject of questions the Government asked Gimenez. So there are no adverse inferences on *those* topics which could be inferred directly from Gimenez's refusal to answer the questions (because none were asked).

An adverse inference is not automatic and a Rule 403 evaluation does not compel the result the United States seeks. *See*, *e.g.*, *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 18-CIV-01479, 2019 WL 8014475, *7 (N.D. Ala. Nov. 4, 2019) ("Courts employ the Rule 403 balancing test to assess the propriety of imposing an adverse inference upon a party based upon a nonparty's invocation of the Fifth Amendment privilege . . . . The fact-intensive analysis which Rule 403 and this [C]ircuit require precludes the notion that adverse inferences will automatically attach to [the] [d]efendants if the former defendants invoke their privilege.").

Any assessment of whether to impose an adverse inference against Hernandez must, in fairness, consider the reality that the contempt finding the United States seeks against both defendants must be established by clear and convincing evidence. *Me Tech.,*

*Inc. v. Brownstein*, No. 20-61508-CIV, 2020 WL 5803486, at *1 (S.D. Fla. Sept. 14, 2020), report and recommendation adopted, No. 20-61508-CIV, 2020 WL 5800998 (S.D. Fla. Sept. 29, 2020) (recommending that the defendant not be found in contempt and explaining that the movant "ha[d] been unable to point to evidence that proves by **'clear and convincing' evidence** that [the] [d]efendant was in control of the Instagram page after the dates on which the TRO and [p]reliminary [i]njunction were entered or that he remain[ed] in control currently" (emphasis supplied)).

The United States argues that Hernandez does in fact control Gimenez's activities as a tax preparer, while Hernandez argues that they prepare returns independently and that neither controls the other. To be sure, there is some record evidence to confirm the United States' theory, but the Undersigned is not convinced for present purposes to conclude that the Government has established the control factor by clear and convincing evidence. *See*, *generally*, *LiButti v. United States*, 107 F.3d 110, 123-124 (2d Cir. 1997) (listing non-exclusive factors to consider in guiding analysis of whether the assertion of the Fifth Amendment privilege by a non-party witness should lead to an adverse inference).[2]

During the evidentiary hearing, Hernandez introduced evidence and argument to support his view that the Ackermans' tax return was correctly prepared. Although the

---

[2]     The four factors are: (1) the nature of the relevant relationships; (2) the degree of **control** of the party over the witness; (3) the compatibility of the interests of the defendant and witness in the litigation; and (4) the role of the witness in the litigation. *LiButti*, 107 F.3d at 123-124) (emphasis added).

Undersigned is not now conclusively determining whether the United States proved by clear and convincing evidence that this one tax return was fraudulent, the factual analysis is hardly a slam dunk in favor of the Government's position. The United States did not present any specific evidence to demonstrate the precise percentage of support which the Ackermans provided to their relative.

Therefore, if an adverse inference were to be applied against Hernandez, then it could be the only evidence against him on this allegation. If that were to occur, then it would run afoul of the rule that a court should draw an adverse inference only if there is independent evidence corroborating it. *Me Tech.*, 2020 WL 5803486, at *3. And that would also render the result unfairly prejudicial. *Cf. Custer Battles*, 415 F. Supp. 2d at 636 (granting in part and denying in part request for a jury instruction allowing permissible adverse inferences but reducing number of adverse inferences to "those few that related to the heart of the alleged fraud, and which have the most reliable basis").

Finally, the Undersigned also deems significant the overall context in which the requested adverse inference arises: in a scenario where Hernandez answered every question asked of him and never asserted the Fifth Amendment. This suggest that his interests and Gimenez's interests may not be entirely aligned -- which relates to the *LiButti* factors.

The Undersigned will not invoke an adverse inference against Hernandez in the Report and Recommendations concerning the requested contempt finding the United States seeks for Defendant's alleged violations of the Injunction.

### Gimenez

The analysis concerning Gimenez, however, is substantially different. As outlined below, the Undersigned will be recommending in the final Report and Recommendation on the requested contempt finding that the Court draw an adverse inference against Gimenez based on his wholesale refusal to answer any substantive questions through his assertion of the Fifth Amendment. However, the recommendation will also be that the Court not rely *solely* on the adverse inference as grounds to support the requested finding of contempt. Several factors support the conclusion that an adverse inference against Gimenez is permissible and applicable here.

First, the requested inference is being sought against the very person who repeatedly invoked the Fifth Amendment and refused to answer any substantive questions. Thus, as noted in *LiButti,* 107 F.3d at 124, the district court should be mindful of Justice Brandeis' classic admonition: "Silence is often evidence of the most persuasive character." *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S. Ct. 54, 56, 68 L.Ed. 221 (1923).

Second, the purpose of an adverse inference is to limit the prejudice to the examining party who was denied available evidence by a witness's invocation of the privilege. *Willingham v. Cnty. of Albany,* 593 F. Supp. 2d 446, 452 (N.D.N.Y 2006); *see also SEC v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir. 1994) ("In general, prejudice flowing from a Fifth Amendment plea is borne by the party asserting the privilege."). The United States is the party who is prejudiced by Gimenez's refusal to answer questions, and that prejudice is aggravated by the fact that he previously submitted a declaration and exhibits to oppose the United States' effort to hold him in contempt. *Graystone Nash*, 25 F.3d at 191–93; *Aim Recycling of Fla., LLC v. Metals USA, Inc.,* No. 18-cv-60292, 2020 WL 209860, at *8, 9 (S.D. Fla. Jan. 13, 2020) (explaining that courts should "measure [] the relative weights of the parties' competing interests") (citing *Wehling v. Columbia Broad. Sys.,* 608 F.2d 1084, 1088 (5th Cir. 1979)).

Third, courts have held that declining to draw an adverse inference is especially prejudicial to the opposing party when the invoking witness is represented by counsel. *See*, *e.g., Graystone Nash*, 25 F.3d at 192–93. Although the consequences of invoking his privilege should "not be too costly," they must also not "be **costless**." *Id*. at 191 (emphasis added).

Fourth, the Undersigned rejects Gimenez's argument that an adverse inference here would lack "persuasive value." [ECF No. 106, ¶ II.B]. This is unconvincing. Like any evidence, the inference must be weighed against the other evidence to determine whether

the United States meets its burden of proof. *See, e.g., SEC v. Monterosso*, 746 F. Supp. 2d 1253, 1263 (S.D. Fla. 2010) (explaining that an adverse inference may not result in automatic summary judgment). And that is exactly what I will do when I evaluate the Government's contempt request and perform the analysis necessary to issue the Report and Recommendations (assuming that the case does not get resolved through a settlement).

The United States concedes that it would be improper to find Gimenez in contempt based solely on his Fifth Amendment assertions. [ECF No. 108, p. 7]. It recognizes that an adverse inference is available only when independent admissible evidence supports a finding that he violated the Injunction. Naturally, the United States contends that there is substantial evidence to support the alleged violations.

The United States' memorandum provides a witness-by-witness outline of the evidence it believes supports the alleged violations. Without reaching any final conclusions about the ultimate sufficiency of the testimony, the Undersigned is satisfied that it is sufficient to provide the independent evidence necessary to allow the adverse inferences. Whether the inferences and the evidence combined is sufficient to satisfy the Government's burden to prove the alleged violations by clear and convincing evidence is another question (and one left for the Report and Recommendations).

Fifth, Gimenez disputes the sufficiency of this evidence, arguing that the signatures on the Customer Information Organizers alone absolve him of any duty to

investigate inconsistencies between the clients and their supporting documentation. He argues that he may rely on customer signatures as proof the return information is accurate, even where that information is not logical. The Injunction imposes additional duties on him to ensure the accuracy of that information and, subsequently, those returns. [ECF No. 44 ¶ I, II, IV].[3] Without an adverse inference, the United States would be prejudiced because Gimenez's Fifth Amendment assertions prevent the United States from probing his role vis-à-vis his clients, even though he, in effect, seeks to shift blame to them by pointing to their certifications of accuracy.

The Undersigned concludes that an adverse inference against Gimenez is appropriate here in order to ameliorate the prejudice his Fifth Amendment assertions at the evidentiary hearing generated against the United States.

**Proposed Findings and Conclusions**

As required by the Undersigned's Post-Evidentiary Hearing Administrative Order [ECF No. 95], the Parties will each, within three weeks of this Order, file on CM/ECF their proposed report and recommendations containing findings of fact and conclusions of law. By the same deadline, the Parties will also submit to the Undersigned's e-file inbox (goodman@flsd.uscourts.gov) courtesy copies of their submissions in Microsoft Word

---

[3]     For example, paragraph II(b)(i) provides that "[if the taxpayer is unable to provide documentation with respect to a particular income or expense item enumerated in the Schedule C Preparation Organizer, the Defendants are enjoined from including the income or expense item on the taxpayer's Schedule C."

format. The Undersigned will **not provide any enlargements of time absent compelling circumstances bordering on a bona fide emergency**.[4]

DONE AND ORDERED in Chambers, in Miami, Florida, June 30, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Cecilia M. Altonaga
All Counsel of Record

---

[4] The Parties should immediately file a notice with the Court on CM/ECF if they resolve the show cause/request-for-contempt issue. This reminder is particularly relevant if a settlement is reached *after* the Parties submit their proposed reports and recommendations but *before* I issue my Report and Recommendations. If a settlement were to be reached in this *de facto* procedural "Twilight Zone", then the Undersigned will have spent a significant amount of time working on what would turn out to be an ultimately unnecessary project. This practical point remains vital even if a settlement is only partial or concerns only one of the two Defendants.