UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 18-20783-CIV-ALTONAGA/GOODMAN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

FRANCISCO HERNANDEZ and
HUGO GIMENEZ,

     Defendants.

_____/

## REPORT AND RECOMMENDATIONS

Following the United States of America's ("United States" or "Government") filing of a Motion to Show Cause [ECF No. 53], which the Court granted [ECF No. 54], Chief United States District Judge Cecilia M. Altonaga referred to the Undersigned for a Report and Recommendations the issue of "**whether** Defendants should be **held in contempt** for violating [certain terms of] the October 31, 2018 Injunction [ECF No. 44]." [ECF No. 76 (emphasis supplied)].

Because the Injunction provides that Defendants may be held in **contempt** "in the event that Defendants **willfully** violate the terms of this Injunction, as determined by this Court upon motion for order to show cause" [ECF No. 44, ¶ VII (emphasis added)], the Undersigned must necessarily determine if they *willfully* violated the Injunction.

In order to make that determination, the Undersigned held an evidentiary hearing. Defendant Francisco Hernandez testified but Defendant Hugo Gimenez did not. Instead, Gimenez, on advice of counsel, asserted his Fifth Amendment rights against self-incrimination to all substantive questions.

A finding of contempt (which would be based on a finding of a willful violation) generates substantial and grave consequences for Defendants, as they both agreed, as part of the Consent Injunction, to be **permanently** enjoined from working as federal tax return preparers if the Court were to determine they committed willful violations of the injunction.[1] In that same Consent Injunction, both Defendants agreed, without further proceedings, to immediate revocations of their preparer tax identification numbers

---

[1]      Defendants' agreement was actually even *broader* than that. Specifically, they agreed to *also* be permanently enjoined from the following *additional* activities: "supervising or managing federal tax return preparers, or assisting with, or directing the preparation or filing of federal tax returns, amended returns, claims for refund, or other related documents, for any person or entity other than themselves or an entity that they own, or appearing as a representative on behalf of any person or organization, other than for themselves or an entity that they own, in connection with any laws or regulations administered by the Internal Revenue Service[.]" [ECF No. 44, ¶ VII.b.].

("PTINs") and electronic filing identification numbers ("EFINs") and disbarment from practice before the Internal Revenue Service ("IRS") in any capacity upon a finding of a willful violation.

Thus, it is not an exaggeration to say that the United States' motion has placed Defendants' entire professional careers as federal tax return preparers in jeopardy. A finding of a willful violation would cause the *mandatory* (by agreement) disbarment from work as a federal tax return preparer (and related activities) and a potential contempt.

Before outlining what happened at the evidentiary hearing, the Undersigned will first discuss Gimenez's procedural-jurisdictional challenge: he contends the injunction *expired* by its terms on December 31, 2021 and was *unenforceable* during the time periods at issue and therefore cannot serve as the basis of a contempt finding.

### The Injunction Did Not Expire on December 31, 2021

Gimenez contends that the Consent Injunction expired. He said this result is likely a mistake but argues that no one moved to modify the injunction to correct the error and that it is too late to do so now.

Specifically, Gimenez says that the Consent Injunction expired by its terms on December 31, 2021, before any of the conduct the United States identifies in its show cause motion as giving rise to alleged violations. He concedes that the purported expiration appears to have been the result of an "oversight," [ECF No. 112-1, p. 20], but he argues

that an injunction nevertheless must be enforced as written and that the interpretation of its terms is confined to "within its four corners." He cites *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) in support.

Therefore, Gimenez continues, because the Consent Injunction had already expired during the period at issue, it is unenforceable and cannot serve as the basis for holding him in contempt. He relies upon *Victory v. Berks Cnty.*, 789 F. App'x 328, 333 (3d Cir. 2019) ("Expired injunctions are nullities. They are . . . unenforceable by the district court, and so cannot present a live case or controversy.").

Gimenez notes that the parties *agreed* to the Consent Injunction entered on October 31, 2018. [ECF No. 44]. That Injunction explicitly stated, at paragraph IX, "It is FURTHER ORDERED that this Injunction shall be effective from the date of entry hereof and shall expire on December 31, 2021, unless a superseding Permanent Injunction is sought and entered before that time." *Id.* at ¶ IX. The Injunction was modified, upon joint motion, on December 27, 2021. *See* [ECF No. 50]. Gimenez contends that the Court's modification retained the original December 31, 2021 deadline. The operative language of the modification order reads as follows:

The Court modifies the injunction entered on October 31, 2018, as follows:

1. Defendants must provide all customers with the Short Form Customer Information Organizer (attached as Exhibit A) and relevant modules. The Short Form Customer Information Organizer prompts customers to

4

fill out certain modules in accordance with their financial circumstances. Defendants are required to provide all customers with copies of the modules with the Short Form Customer Information Organizer.

2. The parties will finalize the substance and form of the modules by January 9, 2022.

3. Defendants must record that the Short Form Customer Information Organizer (and relevant modules) were timely completed by the customer in one of two ways:

    a. the customer completes the Short Form Customer Information Organizer (and modules) by hand (not digitally) and provides ink answers and initials and dates each page; or

    b. the customer emails the Short Form Customer Information Organizer (and modules and accompanying supporting documentation) to Defendants, in which case Defendants must maintain the transmission email in its original, native format so that the attachments can be paired with the email and verified.

4. Defendants must retain all documents in each customer's file, including the Short Form Customer Information Organizer (with supporting documentation and modules) and any cover letter or cover email from the customer.

5. This modification eliminates the Long Form Customer Information Organizer (attached as Exhibit B).

6. **All other provisions of the Injunction not addressed above <u>remain in force.</u>**

5

[ECF No. 50, ¶¶ 1-6 (emphasis added)].

Accordingly, Gimenez reasons, by its terms, this modified injunction retained the original December 31, 2021 expiration date. The modified injunction explicitly states that "all other provisions of the [Original] Injunction not addressed above remain in force." *Id.* at ¶ 6. And the expiration of the Injunction was not "addressed above" or referenced anywhere within the modification. *Id.*

This may have been an error, Gimenez admits, but he emphasizes that neither party ever moved to modify the Injunction to correct the error. *See Baron v. Stawbridge & Clothier*, 1986 WL 5163, at * 6–7 (E.D. Penn. May 5, 1986) (modifying a previously entered injunction that omitted terms based upon oversight that "amounts to a ministerial or procedural error"); *see also* Fed. R. Civ. P. 60(a) ("The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record."). And even if such a modification were to be made at this stage, Gimenez argues, the Injunction could not be applied to Gimenez retroactively. *See Alley v. U.S. Dept. of Health and Human Servs.*, 590 F.3d 1195, 1206 (11th Cir. 1209).

The Undersigned is not convinced.

The Court granted the parties' motion to modify the Injunction, which included the parties' consent to extend the Injunction until December 31, 2022. The Injunction was not rendered a "nullity" by an inadvertent oversight in the Court's Order.

The Court's interpretation of its own injunction is afforded great deference. *Alley*, 590 F.3d 1195, 1202 (11th Cir. 2009). An injunction should be strictly construed, but it "should not be pressed to a dryly logical extreme" giving rise to technical loopholes. *Id.* at 1206. Through his "overly literal [and] hyper technical reading" of the Injunction, Gimenez asks the Court to create a technical loophole that would allow him to back out of his agreement to extend the Injunction through 2022. *Id.* at 1205.

The Court may reform the Injunction to reflect the parties' intentions and correct a mutual clerical error. Because a consent injunction is construed as a contract between two parties, the Court can interpret it like any other contract. *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975).

A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or inadvertence, express something different in the written instrument. *Dantzler, Inc. v. PNC Bank, Nat. Ass'n*, 946 F. Supp. 2d 1344, 1369 (S.D. Fla. 2013) (Altonaga, J.) (internal quotations and citations omitted).

Thus, clear and convincing evidence of the parties' intent will overcome any omission in the Injunction that resulted from a mutual mistake. *Kirchein v. Pet Supermarket, Inc.*, Case No. 16-60090, 2017 WL 11678308, at *2 (S.D. Fla. Dec. 22, 2017); *Sound Around, Inc. v. Hialeah Last Mile Fund VII LLC*, No. 22-20652, 2023 WL 122655, at *5 (S.D. Fla. Jan. 6, 2023).

It is quite clear that the parties all intended to extend the Injunction from December 31, 2021 to December 31, 2022. In fact, the parties informed the Court of their intent and agreement to extend the Injunction. [ECF No. 49, ¶ 3]. And **Defendants complied with the Injunction's document production requirement throughout 2022 without ever asserting that the Injunction had supposedly expired**.

Further, the order modifying the Injunction included deadlines *beyond* the original expiration date. And the Court extended the Injunction "until litigation relating to the United States' Motion for an Order to Show Cause is no longer subject to appeal." [ECF No. 60]. The Court could not have extended the Injunction if it had expired.

Thus, the actions of the parties and the Court show by clear and convincing evidence that the parties intended the Injunction to be extended until December 31, 2022. Defendants cannot now avoid contempt because the parties' Proposed Order modifying the Injunction (and subsequent Order) accidentally inadvertently omitted the Injunction's expiration date. *See* [ECF Nos. 49-3, 50].

### No Evidence of Hiding Information

In the United States' motion which led to the show cause order, it alleged that Defendants "kept their customers in the dark as to the fraudulent items on their tax returns" by concealing their returns from them, including by "always turning their

computer screens away from their customers." [ECF No. 53, p. 12]. No such evidence was presented at the evidentiary hearing.

*The Consent Injunction*

The Injunction reiterates the standards of conduct imposed on all tax return preparers and adds several additional requirements for Gimenez and Hernandez. For our purposes, the Court identifies and summarizes only those sections of the Injunction that Defendants purportedly violated.

First, Defendants may not engage in conduct subject to penalty under 26 U.S.C. § 6694 to understate a taxpayer's liability or overstate their refund due to an unreasonable position -- one for which there is no substantial authority. [ECF No. 44, ¶ I.a.].

Second, Defendants may not aid, instruct, or assist with the intent to understate a taxpayer's liability or assert an unreasonable, frivolous, or reckless position under 26 U.S.C. § 6694. *Id.* at ¶ I.b.

Third, Defendants may not improperly aid, instruct, or assist with the intent to claim an improper refund under 26 U.S.C. § 6694. *Id.* at ¶ I.c.

Fourth, Defendants may not engage in conduct subject to penalty under 26 U.S.C. § 6695, like failing to conduct due diligence to determine a taxpayer's Head of Household status. *Id.* at ¶ II.c. In conducting their due diligence, Defendants must confirm that the

taxpayer pays more than half of the cost of maintaining the home of a dependent. *Id.* at ¶ II.c.ii.

Fifth, Defendants may not prepare returns that claim false credits, expenses, deductions, or income and must retain documentation to justify those items. *Id.* at ¶¶ I.e, f.

Sixth, Defendants may not engage in any conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws. *Id.* at ¶ I.g.

Seventh, Defendants may prepare Schedules C only if the taxpayer provides documentary substantiation for the expenses reported. *Id.* at ¶ II.b. Although Defendants may rely on the taxpayer's representations on their organizer, Defendants must confirm the substantiation documents furnished are actually attached to the organizer. *Id.* at ¶ II.b. Defendants must also seek confirmation that the expenses are in fact business expenses and not personal expenses. *Id.* at ¶ II.b.iv.

Eighth, Defendants may not prepare any return that claims a deduction for expenses the taxpayer identifies as a non-deductible commuting expense -- by nature here, too, Defendants must seek confirmation about the nature of those expenses. *Id.* at ¶ II.b.v.

Ninth, Defendants may prepare Schedules A only if the taxpayer provides verifiable documentation that the expense was paid and it may be deducted as claimed

on the return -- again, Defendants must confirm the existence and nature of the expense. *Id.* at ¶ II.d. For example, when claiming a non-cash charitable contribution of more than $500 but less than $2,500, the taxpayer must provide Defendants with a detailed listing of each item donated, the date of the donation, and the taxpayer's estimated value of those items. *Id.* at ¶ II.d.iv.

Tenth, Defendants routinely checked off boxes on the Tax Preparer's Due Diligence Checklist. Item 4 asked if "any information provided by the taxpayer or a third party for use in preparing the return, or information reasonably known to you, appear to be incorrect, incomplete, or inconsistent?" For the returns at issue, Hernandez checked "no" (for the Ackermans' return) and Gonzalez checked "no" for the returns he prepared. Defendants must make reasonable inquiries if information furnished to them appears incorrect or incomplete. Likewise, they checked the "yes" box on line 15 of the same form (asking "do you certify that all of the answers on this Form 887 are, to the best of your knowledge, true, correct and complete.).

Eleventh, Defendants must take remedial measures upon discovering a violation by an employee, independent contractor, agent, or other person operating under their supervision or control by: (1) meeting with the preparer and documenting the substance of that meeting and (2) notifying the Department of Justice. *Id.* at ¶ V.

Finally, violations of one Defendant may not be imputed against the other if they prepare tax returns independently of one another. *Id.* at ¶ VI.

### *Summary of Recommendation*

For the reasons discussed below, the Undersigned recommends the District Court (1) *not* hold Hernandez in contempt because the United States did not prove by clear and convincing evidence that he willfully violated the terms of the Consent Injunction and because he and Gimenez prepared returns independently; but (2) find Gimenez in contempt because the United States *did* meet its burden to establish willful violations by him through clear and convincing evidence.

## I.    Findings of Fact

The Undersigned makes the following findings of fact based on the evidence presented at the hearing and the parties' filings in this case. The Undersigned begins with an outline of the procedural history. Next, the Undersigned provides findings about Defendants' tax preparation in general, including the customer experience in general. Then, the Undersigned lists my findings about Defendants' preparation of the tax returns for the customers who testified.

### *Procedural History*

1.      In 2018, the United States filed a complaint alleging Francisco Hernandez and Hugo Gimenez, tax return preparers at Francisco Hernandez Tax Services, LLC

("FHTS"), engaged in fraudulent conduct when preparing federal tax returns for their customers. [ECF No. 1, ¶¶ 5, 6].

2.      Hernandez owns and operates FHTS and prepares tax returns for others at FHTS. [May 26 Hr'g Tr. 67:24–68:5, 102:22–24].[2] He has prepared tax returns since 2000 and formed FHTS in 2005. [May 26 Hr'g Tr. 67:24–68:5, 102:22–24].

3.      Gimenez has been a tax return preparer at FHTS for more than a decade. [May 25 Hr'g Tr. 100:2–6; May 26 Hr'g Tr. 109:18–22]. Gimenez is an independent contractor. [May 26 Hr'g Tr. 79:18–80:4, 99:5–13].

4.      The Complaint sought to enjoin Hernandez and Gimenez, and all those acting in concert with them, or under their direction and/or control, from preparing, filing, or assisting in the preparation or filing of federal tax returns. [ECF No. 1, ¶ 1].

5.      Upon joint motion by the parties, the Court entered the subject Injunction on October 31, 2018. [ECF. No. 44].

6.      The Injunction authorized the United States to request customer files and documents from Defendants to monitor their compliance with its terms. Id. at ¶ VIII. In 2021, the United States determined that files and documents Defendants produced

---

[2]      Citations to ("May 25 Hr'g Tr.") refer to pages of the May 25, 2023 Hearing Transcript. A copy of the corrected May 25, 2023 hearing transcript is available at ECF No. 102. Citations to ("May 26 Hr'g Tr.") refer to pages of the May 26, 2023 Hearing Transcript. A copy of the May 26, 2023 hearing transcript is available at ECF No. 101.

showed they failed to comply fully with the Injunction. [ECF No. 49]. When confronted with their violations, Defendants agreed to modify and extend the Injunction through 2022. [ECF Nos. 49–50].

7.      According to the United States, even after Defendants consented to an extension of the Injunction for their failure to comply with its requirements, they failed to comply with its terms again in 2022. [ECF No. 53, p. 5]. The United States then filed a motion for an order requiring Defendants to show cause why the Court should not hold them both in contempt for violating the Injunction. *Id.* It also requested that the Court issue a permanent injunction enjoining Defendants from acting as tax preparers and disbarring them from practicing before the IRS, in any capacity. *Id.* at 15.

8.      The Court granted the motion (procedurally) and entered an order to show cause, directing Defendants to file written responses as to why they should not be held in contempt for violating the Injunction. [ECF No. 54].

9.      Following briefing by the parties, the Court held an evidentiary hearing on May 25 and 26, 2023.

10.     The Court directed the parties to submit proposed Reports and Recommendations.

14

*Hernandez's Role at FHTS*

11.     Hernandez is the sole owner of FHTS, which provides tax preparation services for individuals and businesses. [May 25 Hr'g Tr. 17:19–24]. His name appears on the office door and on every return prepared in his office (regardless of who prepares it), and every piece of paperwork provided to customers. [May 25 Hr'g Tr. 20:1–2, 41:20–25]; *see also, e.g.*, [ECF Nos. 86-1, 86-3, 86-4].

12.     In addition to his role as owner, Hernandez is an independent return preparer and FHTS's office manager. [May 26 Hr'g Tr. 75].

13.     Hernandez prepares "approximately a thousand returns" per year on behalf of his clients, most of whom are "9:00 – 5:00 workers making 30-40 grand a year on average." [May 26 Hr'g Tr. 76].

14.     FHTS has three employees, each of whom are secretaries who do not prepare tax returns for clients. [May 25 Hr'g Tr. 18-19]. The three employee-secretaries answer telephones, prepare the folders for clients, conduct status checks for the clients when they call in to see why they haven't received their refunds, they make and confirm appointments, and they do the front-of-the-house work. *Id.*

15.     Hernandez has several tax preparers at FHTS. The preparers, including Gimenez, are independent contractors (rather than W-2 employees). [May 25 Hr'g Tr. 19:4–15]. He personally selects and hires FHTS's tax preparers -- each of whom he trusts

and has known for a long time -- and he can fire them. [May 25 Hr'g Tr. 20:9–13, 21:23–

24]. Hernandez also furnishes his preparers with a workstation, meals, and the resources

they need to prepare returns, like software, for FHTS customers. [May 25 Hr'g Tr. 19:20–

25].

16.     Each independent contractor, including Hernandez and Gimenez, is

incorporated and provides return preparation services through their own single member

corporate entity. [May 25 Hr'g Tr. 19].

17.     Outside of tax season, Hernandez resolves customer service issues for all

FHTS customers, even those who had their returns prepared by the other preparers at

FHTS. [May 26 Hr'g Tr. 86:13–14, 108:3–9, 115:15–116:2]. And he responds on behalf of

his preparers to letters from the IRS. [May 26 Hr'g Tr. 116:7–15].

18.     Hernandez requires his preparers to use the FHTS EFIN to e-file tax returns

and to show him proof they have valid PTINs. [May 26 Hr'g Tr. 91:7–21, 92:17–18, 108:10–

14, 109:1–10]. The preparers use FHTS's EFIN so that he may deduct his share of each fee

more conveniently. [May 26 Hr'g Tr. 92:5–11].

19.     Additionally, Hernandez personally trains his preparers, requiring them to

shadow him while he prepares tax returns for customers. [May 25 Hr'g Tr. 20:14–16; May

26 Hr'g Tr. 109:18–22]. "Shadowing" consists of watching Hernandez prepare five

returns. After that minimal period of observation, the preparer completes a few returns

under Hernandez's supervision before preparing returns on their own. [May 25 Hr'g Tr. 20:17–23].

20.      After the preparer is on board, Hernandez provides sporadic trainings on changes to the tax laws and regulations, most of which are optional. He has required attendance at only two trainings in the past several years. [May 25 Hr'g Tr. 21:3–7, 21:19–22]. He also hosts a mandatory "preseason meeting" before filing season begins to discuss arising tax issues. [May 25 Hr'g Tr. 21:9–18].

21.      But Hernandez never reviews the work of his independent contractor tax preparers. [ECF No. 97-1]; *see also* [May 25 Hr'g Tr. 20:14–16; May 26 Hr'g Tr. 80:23–25, 108:17–23, 109:18–22].

22.      FHTS charges customers a fee to prepare their tax returns. [May 25 Hr'g Tr. 33:4–34:3]. The fee is determined by the number of forms prepared. [May 25 Hr'g Tr. 42:1–6]. So the fee increases as the number of forms increases (like Schedules A and C, and Form 7202 for the COVID credit). The preparer's share of each fee also increases with each additional form prepared. [May 25 Hr'g Tr. 33:10–17, 42:1–6; May 26 Hr'g Tr. 77:3–12].

23.      Hernandez collects 60% of each fee the preparers receive when preparing tax returns, whether the customer pays out-of-pocket or out of their return. [May 25 Hr'g

Tr. 35:10–12; May 26 Hr'g Tr. 102:18–24]. Each preparer retains 40% of each fee. [May 26 Hr'g Tr. 93:8–13, 102:4–5].

24.    When the customers pay out of their refunds, the money runs through FHTS's bank account so that Hernandez can easily collect his share. [May 25 Hr'g Tr. 34:18–35:8; May 26 Hr'g Tr. 92:24-93–18]. The process is run through Santa Barbara Bank & Trust ("Santa Barbara"). Santa Barbara deducts a $60 fee from the refund for itself. It deducts the tax preparation fee from the refund and sends that to Hernandez's account. The remainder is sent to the customer in the manner chosen by the customer. [May 25 Hr'g Tr. 34:18–35:8; May 26 Hr'g Tr. 92:24–93:18].

25.    Hernandez does not supervise or control FHTS's independent return preparers and does not review the tax returns they prepare for the clients. [May 26 Hr'g Tr. 80]. Similarly, Hernandez does not exercise control over Gimenez, and Gimenez does not exercise control over Hernandez. [May 26 Hr'g Tr. 100].

26.    Likewise, Hernandez does not work on Gimenez's clients' tax returns, and Gimenez does not work on Hernandez's clients' tax returns. *Id.*

27.    As described by Hernandez, "[o]ne EFIN represented one bank account, one location where the e-File is coming from. If all my guys were to have EFINs, that would be five different EFINs, that's five different programs, five different bank accounts. The accounting for that would be a nightmare." [May 26 Hr'g Tr. 92]. FHTS's EFIN is

18

distinguishable from the PTINs maintained by the independent return preparers and also affixed to each client's tax returns at the time of filing. [May 26 Hr'g Tr. 91].

*The FHTS Customer Experience*

28.    FHTS serves a large community of low-income, predominantly Spanish-speaking customers. [May 25 Hr'g Tr. 40:1–3]. Most customers have very little or no knowledge of tax law and many speak only Spanish and/or understand very little English. [May 25 Hr'g Tr. 87:14–18, 111:11–14, 116:11–14, 137:21–25, 166:23–167:6; May 26 Hr'g Tr. 18:23–19:6, 26:20–23].

29.    When a customer arrives for their appointment, a secretary verifies the customer's personal information and collects documents like W-2s, Forms 1099, Forms 1095-A, and bank statements. [May 26 Hr'g Tr. 59:5–13]. The secretary makes copies of all the required documentation. [May 26 Hr'g Tr. 59:14–16].

30.    The customer is asked to complete a customer organizer to provide personal and tax-related information. [May 26 Hr'g Tr. 59:22–60:1]. If the customer cannot understand certain information in the customer organizer, then he leaves it blank for the preparer to complete. [May 26 Hr'g Tr. 59:3–60:23]. Sometimes, customers sign and initial blank forms before meeting with their preparer. [May 25 Hr'g Tr. 125:22–126:4; May 26 Hr'g Tr. 20:25–21:10].

31.     Customers go into the appointment with the preparer with all the supporting documentation they brought with them and a customer organizer that has been completed to the best of the customer's ability. [May 26 Hr'g Tr. 60:4–23]. This allows the preparer to review all the materials provided by the customer. [May 25 Hr'g Tr. 25:19–21; May 26 Hr'g Tr. 62:14–21].

[Having laid out FHTS's business and the customer experience in general, the Undersigned now turns to specific customers who testified at the hearing and about whom the Government questioned Defendants. The findings below are based on the testimony that the Undersigned finds credible and supported by documentary evidence.].

32.     The United States proffered two reasons why the Court should hold Hernandez in contempt of the Injunction.

33.     First, the United States argues that Hernandez violated the Injunction when he prepared the 2021 tax return for his clients, Eric and Joyce Ackerman, a married couple filing jointly. According to the United States:

> Hernandez falsely claimed Joyce Ackerman's father [(Jack Weiss)] as a dependent on her 2021 joint federal income tax return. When Hernandez inquired into her father [sic] status as a dependent, Mrs. Ackerman told him that her father did not live with her and had his own home, but he visited her home for dinner every night. She also told Hernandez that although she stocked his fridge and pantry for about $25 per week, he otherwise paid his own utilities, gas, car insurance,

and car payment. Hernandez asked no other questions to determine Mrs. Ackerman's father's 2021 gross income or whether Mrs. Ackerman provided more than half of her father's support in 2021. But he had to ask those questions as part of the diligence required by the Injunction. His failure to do so is a willful violation of the Injunction and shows his contempt for this Court.

[ECF No. 53, at 9-10 (internal citations omitted)].

34.     Second, the United States claims that Hernandez should be held in contempt based on the alleged compliance failures of his co-defendant, Gimenez, whom the United States has charged with contempt based on his tax return preparation for four separate taxpayers. [ECF No. 62, p. 9].

### *Yunier Cabrera*

35.     Yunier Cabrera is a Spanish-speaking security guard who patrols a single neighborhood block each day of the work week. [May 25 Hr'g Tr. 86:11–20]. Lacking any knowledge about tax law and tax return preparation, he hired Gimenez to prepare and file his 2021 federal tax return and trusted him to provide that service in accordance with U.S. tax laws. [May 25 Hr'g Tr. 87:14–88:10, 89:2–7, 99:12–100:1].

36.     The Undersigned finds that Gimenez inadequately considered Cabrera's minimal English language skills and lack of knowledge on tax laws when preparing his return. Gimenez received only basic information from Cabrera and asked questions to elicit responses that would support deductions without reviewing documents that might

undermine the deduction and without asking for additional details. Then, at the end of the appointment, Gimenez simply directed Cabrera to sign his return and its accompanying forms without any explanation. [May 25 Hr'g Tr. 101:5–20, 103:19–104:18].

37.     The following are the items on Cabrera's Schedule C that Gimenez claimed for him without verifying that the expenses were accurate and supported by receipts, bank statements, and other documents:

      a.     $6,057 of car and truck expenses;

      b.     10,816 miles driven over 52 weeks;

      c.     $780 of toll expenses over 52 weeks;

      d.     $1,560 of phone expenses;

      e.     $250 of tax and licensing expenses; and

      f.     $670 of uniform expenses.

[ECF No. 103-2, pp. 10–11]; *see also* [May 25 Hr'g Tr. 50:18–51:12, 51:13–19, 55:2–56:1, 56:2–14].

38.     Cabrera told Gimenez that he drives his car only to commute from his home to his single work location. [May 25 Hr'g Tr. 91:22–92:7]. Gimenez never asked him whether he had a home office or performed work-related tasks at home (he has no office and performs no work at home). [May 25 Hr'g Tr. 91:14–92:7, 95:7–16]. Because Cabrera

has no home office and performs no work at home, his home is not his principal place of business. Nonetheless, Gimenez deducted the car and travel expenses highlighted above.

39.     Cabrera also told Gimenez that he used his cellphone for personal and work purposes (he does not have separate phones), but Gimenez deducted his entire phone bill expense of $1,560. [ECF No. 103-2, p. 11]; *see also* [May 25 Hr'g Tr. 51:25–52:11, 92:8–21, 95:23–96:6].

40.     Indeed, Gimenez failed to review with Cabrera, or independently, any documents provided by Cabrera -- including documents Gimenez requested -- that purportedly justified the deducted expenses or mileage. [May 25 Hr'g Tr. 50:18–51:12, 51:13–19, 51:20–24, 51:25–52:11, 52:12–17, 53:15–20, 53:21–54:16, 54:17– 55:1, 56:2–14].

41.     In addition to his failure to verify the deductions on Schedule C, Gimenez claimed a credit for COVID-relief on Cabrera's return, even though Cabrera credibly testified that he told Gimenez that he did *not* contract COVID in 2021 and never missed work for any COVID-related reason. [ECF No. 103-2, p. 15 (line 1)]; *see also* [May 25 Hr'g Tr. 52:15–53:3, 93:6–16, 112:24–114:6].

42.     Despite not reviewing the bank statements provided by Cabrera and disregarding Cabrera's statement that he did not miss work for any COVID-related reason in 2021, Gimenez certified (on the Tax Preparer's Due Diligence Checklist) that the information provided to him to prepare Cabrera's return did not appear to be incorrect,

23

incomplete, or inconsistent. [ECF No. 103-2, p. 13 (line 4)]. He also certified that all of the answers were, to the best of his knowledge, "true, correct and complete." *Id.* at 14 (line 15).

### *Ayleen Garcia*

43.     Ayleen Garcia is a nurse who had her tax return prepared by Gimenez for the first time in 2022. She previously used a different company. [May 25 Hr'g Tr. 116:17–117:7]. She, too, has no experience preparing tax returns and generally has no knowledge of tax law. [May 25 Hr'g Tr. 116:11–12]. Garcia brought her ID, social security information, W-2s, property tax information, mortgage statements, and insurance information to the appointment. [May 25 Hr'g Tr. 117:8–10].

44.     Gimenez prepared Garcia's return while her husband, Rolando Garcia, sat next to her in Gimenez's office. Gimenez prepared his return, as well. [May 25 Hr'g Tr. 118:4–6]. Garcia's organizer indicated she was unmarried, but she provided Gimenez with her property tax and mortgage statements. [ECF Nos. 103-29, p. 2; 103-30]; *see also* [May 25 Hr'g Tr. 64:5–8, 65:16–23]. Both documents reflected her husband's name as an owner of the property. Armed with those documents, Gimenez never asked Garcia if she was married and instead filed her return as Head of Household. [ECF No. 103-26, p. 2]; *see also* [May 25 Hr'g Tr. 64:9–12, 65:24-66:2, 66:10–19, 119:25–120:2, 134:3–4].

45.     Gimenez deducted on Garcia's return two non-cash charitable donations worth $1,400 to the Vietnam Veterans Charity. [ECF Nos. 103-26, p. 4:12; 103-26, p. 10]; *see also* [May 25 Hr'g Tr. 66:20–67:8]. To support the donations, Garcia's customer file included two receipts, that she did not provide, dated March 8, 2022 (for donations that were purportedly made in 2021). [ECF No. 103-32]. Those receipts do not detail each item donated beyond general categories like "bags of clothing," "electrical appliances," and "miscellaneous." *Id*. Nor do they estimate the value of each item as estimated donated. *Id.*

46.     Despite possessing information that Garcia was married -- indeed, Gimenez prepared her husband's return -- Gimenez certified that the information provided to him to prepare her return did not appear to be incorrect, incomplete, or inconsistent. [ECF No. 103-26, p. 9 (Line 15)].

### *Joyce and Eric Ackerman*

47.     Hernandez has prepared Mr. and Mrs. Ackerman's tax returns for more than ten years. [May 25 Hr'g Tr. 138]. Mr. and Mrs. Ackerman claimed Mrs. Ackerman's father, Jack Weiss, as a dependent on their tax returns for each of those years. [May 25 Hr'g Tr. 140-141].

48.     Mr. Weiss is "87 or 88" years old and has no income other than social security. [May 25 Hr'g Tr. 154]. Mr. Weiss does not live with the Ackermans, but visits

their home every night for dinner, and Mr. and Mrs. Ackerman provide Mr. Weiss with the "vast majority" of the food he consumes in his own home, on which there is a reverse mortgage. [May 25 Hr'g Tr. 154-155]. Nobody other than the Ackermans provides support for Mr. Weiss. [May 25 Hr'g Tr. 162]. But Weiss pays the rest of his bills personally, including his credit cards, car payments, utilities, and car insurance. [May 25 Hr'g Tr. 144:12–23].

49. The United States offered no testimony or other evidence as to the dollar amount of the support provided by the Ackermans to Mr. Weiss, the amount of income earned by Mr. Weiss, or the amount of expenses he pays on his own.

50. Mr. and Mrs. Ackerman met with Hernandez in person in February 2022 to prepare their 2021 tax return. [May 25 Hr'g Tr. 138, 151].

51. Mr. and Mrs. Ackerman completed and signed their own organizer prior to meeting with Hernandez, including by certifying under penalties of perjury that all of the information they supplied to Hernandez was true and correct. [May 25 Hr'g Tr. 155-156].

52. All of the handwriting on the Ackermans' organizer for their 2021 tax return was from either Mr. or Mrs. Ackerman; none was Hernandez's. [May 25 Hr'g Tr. 157].

53. For their 2021 tax return, Mr. and Mrs. Ackerman stated in their organizer that no information about their dependents had changed in the prior year. [May 25 Hr'g Tr. 156].

54.     The Ackermans claimed three people in total -- Mr. Weiss and their two daughters -- as their dependents. They listed their three dependents vertically in the designated section of their organizer, and wrote "100%" in the center of the column to the right where the organizer asks for the percentage of support provided to each dependent. [May 25 Hr'g Tr. 144]. In other words, rather than writing "100%" next to each of the three listed dependents, the Ackerman's wrote "100%" only once:



[ECF No. 103-37].[3]

55.     Hernandez relied on the Ackermans' completed and certified organizer when preparing their 2021 tax return, including as it related to claiming Mr. Weiss as their dependent. [May 26 Hr'g Tr. 73-74].

---

[3]     The United States contends that this is ambiguous, and that the 100% number relates only to Victoria, because the 100% appears to be associated with only that one line. In the "Paid Preparer's Due Diligence Checklist [ECF No. 103-35, p. 11 (question 4)], Hernandez certified that none of the information provided by the taxpayer for use in preparing the return "appear[ed] to be incorrect, incomplete or inconsistent." *Id.*

## CERTIFICATION

The undersigned certifies, under the penalties of perjury, that the information provided in response to the foregoing questions is complete and accurate to the best of his or her knowledge. The undersigned further certifies that he or she has provided the information requested herein. The undersigned also certifies that he or she has verified the information provided in this document and states that it comports with the supporting documentation provided, if any.

_____
Taxpayer's Signature

ERIC D. ACKERMAN
Taxpayer's Printed Name

Dated: 02/25/22

_____
Spouse's Signature

Jayes L. Ackerman
Spouse's Printed Name

Dated: 2/26/22

[ECF No. 103-37].

56.     At the conclusion of their in-person meeting, Mr. and Mrs. Ackerman signed their tax return and were provided a printed copy along with a letter with instructions to "review the returns carefully to ensure that there are no omissions or misstatements of material facts." [May 25 Hr'g Tr. 158]. Mr. and Mrs. Ackerman did not review the cover letter or tax return after their meeting with Hernandez. [May 25 Hr'g Tr. 161].

57.     The Ackermans paid FHTS a fee of $295 for the preparation and filing of their 2021 tax return. [May 25 Hr'g Tr. 161]. Mr. and Mrs. Ackerman received a $500 tax credit for claiming Mr. Weiss as a dependent. [May 25 Hr'g Tr. 72].

*Ana Teresa Milanes-Baez*

58.     Ana Teresa Milanes-Baez ("Milanes") is a Spanish-speaking registered behavioral technician and single mother[4] who works with autistic children in their homes. [May 25 Hr'g Tr. 166:15–22, 203:23–204:6]. She knows little about tax law beyond the requirement to file a tax return each year. [May 25 Hr'g Tr. 166:23–167:6]. Gimenez has prepared her tax returns for years. [May 25 Hr'g Tr. 167:11–13]. She was unaware of the Injunction when she hired Gimenez again to prepare her 2021 tax return. [May 25 Hr'g Tr. 167:7–21, 201:7–202:21]. She trusted Gimenez would prepare her return in accordance with U.S. tax law. [May 25 Hr'g Tr. 168:6–11]. As he did for Cabrera, Gimenez prepared a Schedule C to deduct Milanes's purported work-related expenses. [ECF No. 103-9, pp. 10–11]. And, like with Cabrera, the Undersigned finds that Gimenez reported deductions on Milanes's Schedule C without verifying that the expenses were accurate and properly supported.

59.     At her appointment, Milanes completed her organizers to the best of her ability but relied on Gimenez to complete portions that she did not understand due to her language barrier and/or lack of tax law knowledge. [May 25 Hr'g Tr. 48:25–49:5,

---

4     Gimenez marked "Head of Household" as Milanes's filing status. ECF No. 103-9 ("Filing Status"). Milanes was married in 2021 but had been legally separated from her husband since 2019 while finalizing her divorce. [May 25 Hr'g Tr. 203:2–22]. On those facts, she was entitled to file as Head of Household.

168:12–169:10, 176:1–22]. Gimenez did not review Milanes's tax return or its accompanying documents with her. [May 25 Hr'g Tr. 169: 11–13]. He showed her where to sign the forms but did not advise her to read any statement she was signing. [May 25 Hr'g Tr. 14–15, 190:10–193:12]. Gimenez asserted the Fifth Amendment about whether he forged, or directed someone to forge, Milanes's signature on one document in her file. [ECF No. 103-18]; *see also* [May 25 Hr'g Tr. 49:6–8]. Milanes denied that her signature was on the document and testified that she did not know how the signature got on the document. [May 25 Hr'g Tr. 181:24–183:7].

60.     Gimenez completed Milanes's business expense organizer for her and reported several work-related travel expenses on Milanes's return, some of which she credibly testified he reported without her knowledge. [May 25 Hr'g Tr. 58:7–25, 169:16–170:6, 171:4–10].

61.     The Undersigned finds that Gimenez reported the following deductions without oral verification from Milanes or support from bank statements, receipts, and other documents:

    a.     $4,084 of car and truck expenses;

    b.     7,292 miles to either Vista Behavior Health Services ("Vista Behavior") or Friendly Hands Health ("Friendly Hands") offices five days per week over 52 weeks;

    c.     $1,599 for a work cellphone;

      d.        $1,200 for a business cellphone plan;

      e.        $800 for a business desktop computer;

      f.        $840 for a business internet plan;

      g.        $400 for license expense; and

      h.        $2,000 for supervision.

[ECF Nos. 103-9, p. 10 (line 9); 103-20–103-24]; *see also* [May 25 Hr'g Tr. 58:7–25, 60:9–21, 61:7–20, 169:16–170:6, 171:4–10].

62.     Milanes credibly testified that she did not incur any car and truck expenses, that Gimenez never discussed that item with her, and that she visited Vista Behavior and Friendly Hands offices only sporadically to complete paperwork. [May 25 Hr'g Tr. 169:16–170:6, 177:4–179:15]. She also credibly testified that Gimenez did not ask whether the cellphone was her personal phone, and that she told him the phone plan included two additional lines for her children. [May 25 Hr'g Tr. 58:7–25, 171:11–172:4, 172:5–23]. And he did not ask whether she used her computer and internet at home for personal use (she does). [May 25 Hr'g Tr. 172:5–23, 174:4–15].

63.     Gimenez also claimed a deduction of $850 for uniform expenses, even though Gimenez never asked if she wore a uniform. Had he done so, he would have learned that Milanes wore everyday clothes (not a uniform) to her appointments with her clients at the request of their families. [May 25 Hr'g Tr. 173:15–174:3, 197:12–198:2].

64.     In addition, Gimenez deducted $295 of business-related legal and professional services expenses, but he had no documents to support that expense. [ECF No. 103-9, p. 10 (line 17)]; *see also* [May 25 Hr'g Tr. 57:23–58:6, 170:7–19]. Milanes testified that she never discussed that item with Gimenez. [May 25 Hr'g Tr. 170:7–13]. They only discussed the attorney she hired to handle her divorce. [May 25 Hr'g Tr. 170:12–19].

65.     Gimenez failed to review with Milanes or on his own the documents that he requested from her. [May 25 Hr'g Tr. 179:24–180:22].

66.     Finally, in response to Gimenez's questions, Milanes told him that she did not contract COVID in 2021 but missed a few days of work because her client's mother contracted COVID. [May 25 Hr'g Tr. 175:1–25]. Still, Gimenez claimed a credit representing that Milanes missed ten days (two weeks) of work because she contracted COVID. [ECF No. 103-9, p. 24 (line 36)]; *see also* [May 25 Hr'g Tr. 62:2–15].

67.     Despite failing to review the documents Milanes provided him with and ignoring her own statements during their meeting, Gimenez certified (on the Paid Preparer's Due Diligence Checklist) that the information provided to him to prepare her return did not appear to be "incorrect, incomplete, or inconsistent." [ECF No. 103-9, p. 19 (line 4)].

*Nathaly Hernandez*

68.     Nathaly Hernandez ("Ms. Hernandez") is a paralegal at an immigration law firm who paid Gimenez to prepare her 2021 tax return believing he was a professional tax return preparer who would provide his service in accordance with U.S. tax laws. [May 26 Hr'g Tr. 18:17–22, 18:23–19:6, 19:7–18, 20:8–18]. She relied on Gimenez's advice because he had prepared her returns since 2009 and she trusted him as a professional return preparer. [May 26 Hr'g Tr. 23:22–24:4]. Before these proceedings, Ms. Hernandez had no reason to believe there were any problems with Gimenez's services and was unaware of the Injunction. So she continued to return to him each year. [May 26 Hr'g Tr. 43:24–44:13].

69.     Just as Cabrera and Milanes had done, Ms. Hernandez completed only basic forms on her own. [May 26 Hr'g Tr. 20:4–7; 21:24–22:7]. Gimenez completed the forms she could not understand. [May 25 Hr'g Tr. 48:25–49:5; May 26 Hr'g Tr. 24:18–25:7, 27:9–25]. Although Ms. Hernandez signed her return after Gimenez completed it, she signed her other blank organizers before meeting with Gimenez. [May 26 Hr'g Tr. 20:19–21:10]. He completed those documents for her during their meeting but never reviewed them with her to confirm their accuracy. [May 26 Hr'g Tr. 21:1–6, 22:8–16, 28:15–21]. Nor did he review Ms. Hernandez's return with her. [May 26 Hr'g Tr. 22:8–16, 28:15–21]. Gimenez barely discussed any tax-related topics with her; instead, they just talked about life. [May 26 Hr'g Tr. 22:8–16, 28:22–29:3].

33

70.     Ms. Hernandez attended the appointment with her husband. [May 26 Hr'g Tr. 23:19–21]. Gimenez had been preparing Ms. Hernandez's taxes for many years. [May 26 Hr'g Tr. 19:23–20:1]. He had prepared her husband's taxes in 2019. [May 26 Hr'g Tr. 23:2–3].

71.     On one of the basic forms which Ms. Hernandez could adequately complete on her own, she listed her husband and his personal information. [May 26 Hr'g Tr. 21:24–22:7]. She expected her filing status to be "Married Filing Separate." [ECF No. 103-42; May 26 Hr'g Tr. 22:17–23:5]. Ms. Hernandez credibly testified that when she and her husband met with Gimenez, Gimenez tore the page listing her marital status off her packet (knowing they were married) and destroyed it in his document shredder. [May 26 Hr'g Tr. 23:6–21]. He instructed her to complete a new one without her husband's information so that she could instead file as "Head of Household." [ECF No. 103-42, p. 1 (no information listed under "Spouse")]; *see also* [May 25 Hr'g Tr. 68:25–69:7, 71:13–15; May 26 Hr'g Tr. 22:17–23:5, 23:6–21, 24:5–17]. On another form, which Ms. Hernandez's husband had initialed, Gimenez scratched out the husband's name. [ECF No. 103-43 (name scratched under "Full Name" and initials on bottom right-hand corner)]; *see also* [May 25 Hr'g Tr. 71:20–25; May 26 Hr'g Tr. 25:8–26:19]. Once he had removed most indications of Ms. Hernandez's husband from her file, Gimenez marked "Head of

Household" as her filing status. [ECF No. 103-41 ("Filing Status")]; *see also* [May 25 Hr'g Tr. 68:25–69:7].

72.     Despite direct knowledge that Ms. Hernandez was married, Gimenez certified (on the Tax Preparer's Due Diligence Checklist) that the information provided to him to prepare her return did not appear to be "incorrect, incomplete, or inconsistent." [ECF No. 103-41, p. 12 (line 4)].

## II.     Conclusions of Law

### The Government Must Prove
### Defendants' Violations by Clear and Convincing Evidence

1.     To prevail in a contempt proceeding for alleged violation of an injunction, the movant must prove by clear and convincing evidence the defendant violated the injunction. *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002). Clear and convincing evidence leaves the factfinder with "an abiding conviction" that the movant's "factual contentions are [] highly probable." *Diamond Resorts Int'l, Inc. v. US Consumer Attorneys, P.A.*, No. 18-80311-CIV, 2021 WL 9596129, at *2 (S.D. Fla. Apr. 9, 2021). The movant must establish that: (1) the injunction was "valid and lawful," (2) it was "clear and unambiguous," and (3) the defendant could comply with it. *Riccard*, 307 F.3d at 1296 (emphasis added).

2.     In addition, as highlighted earlier, a contempt finding must be based on a willful violation, a requirement of both the Consent Injunction and case law authority. *Id.*

("A finding of civil contempt -- **willful** disregard of the authority of the court -- must be supported by clear and convincing evidence.") (emphasis added).

3.    Courts must "construe any ambiguities in favor of the party charged with contempt." *Peery v. City of Miami*, 977 F.3d 1061, 1077 (11th Cir. 2020); *see also Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1062 (11th Cir. 2001) ("[T]here are two reasonable, competing interpretations, which is the very definition of ambiguity. Given the ambiguity in the final judgment, defendants' conduct in accordance with their reasonable interpretation of the judgment . . . cannot be contumacious.").

### Requirements of the Injunction

4.    The Injunction reiterates the standard of conduct imposed on all tax return preparers and adds several additional requirements for Gimenez and Hernandez. For our purposes, the Court identifies and summarizes only those sections of the Injunction that Defendants supposedly violated.

5.    *First*, Defendants may not engage in conduct subject to penalty under 26 U.S.C. § 6694 to understate a taxpayer's liability or overstate their refund due to an unreasonable position -- one for which there is no substantial authority. [ECF No. 44 ¶ I.a.].

6.      *Second*, Defendants may not aid, instruct, or assist with the intent to understate a taxpayer's liability or assert an unreasonable, frivolous, or reckless position under 26 U.S.C. § 6694. *Id.* at ¶ I.b.

7.      *Third*, Defendants may not improperly aid, instruct, or assist with the intent to claim an improper refund under 26 U.S.C. § 6694. *Id.* at ¶ I.c.

8.      *Fourth*, Defendants may not engage in conduct subject to penalty under 26 U.S.C. § 6695 like failing to conduct due diligence to determine a taxpayer's Head of Household status. [ECF No. 44 ¶ I.d.]. In conducting their due diligence, Defendants must confirm that the taxpayer pays more than half of the cost of maintaining the home of a dependent. *Id.* at ¶ II.c.ii.

9.      *Fifth*, Defendants may not prepare returns that claim false credits, expenses, deductions, or income and must retain documentation to justify those items. *Id.* at ¶¶ I.e, f.

10.     *Sixth*, Defendants may not engage in any conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws. *Id.* at ¶ I.g.

11.     *Seventh*, Defendants may prepare Schedules C only if the taxpayer provides documentary substantiation for the expenses reported. *Id.* at ¶ II.b. Although Defendants may rely on the taxpayer's representations on their organizer, Defendants must confirm

the substantiation documents furnished are actually attached to the organizer. *Id.* at ¶ II.b. Defendants must also seek confirmation that the expenses are in fact business expenses and not personal expenses.

12.    *Eighth*, Defendants may not *prepare* any return that claims a deduction for expenses the taxpayer identifies as a non-deductible commuting expense. *Id.* at ¶ II.b.v.

13.    *Ninth*, Defendants may prepare Schedules A only if the taxpayer provides verifiable documentation that the *expense* was paid and it may be deducted as claimed on the return. *Id.* at ¶ II.d. For example, when claiming a non-cash charitable contribution of more than $500 but less than $2,500, the taxpayer must provide Defendants with a detailed listing of each item donated, the date of the donation, and the taxpayer's estimated value of those items. *Id.* at ¶ II.d.iv.

14.    *Tenth*, Defendants must take remedial measures upon discovering a violation by (1) meeting with the preparer and documenting the substance of that meeting and (2) notifying the Department of Justice. *Id.* at ¶ V.

15.    *Finally*, violations of one *defendant* may not be imputed against the other if they prepare returns independently of one another. *Id.* at ¶ VI.

### *Customer Signatures Do Not Absolve Defendants of Their Responsibilities*

16.    At the hearing, counsel for Gimenez and Hernandez consistently accused their customers of providing false information of their marital statuses, business

expenses, charitable donations, and dependents. They confronted each customer with their signatures that certified, under penalty of perjury, that the information on their returns and organizers were true and correct.

17.     But, as with any evidence, the weight accorded to the signatures is affected by their context. Many FHTS customers speak and understand very little (if any) English. Some of them signed and initialed blank organizers before their appointments at which Gimenez filled in the information based on cursory and often misleading lines of questioning. So, when the customers attest that the returns were true, correct, and complete to the best of their knowledge and belief, they do so with knowledge and belief that Gimenez prepared the return in accordance with the tax laws.

18.     Based on the record evidence for the four returns he prepared, Gimenez seemingly asked his customers just enough questions to report an arguably deductible item on their returns; his questions stopped when their continuation would increase a customer's tax liability; and finally, he would direct them to sign their certifications verifying the truth and accuracy of Gimenez's work.

19.     Here is a basic, illustrative hypothetical with the business cellphone expense deduction:

    Q: Do you have a cellphone?

    A: Yes.

Q: How much did you pay for your cellphone?

A: $1,000.

Gimenez intentionally failed to ask some of the most important questions: whether that phone was used for business or personal purposes. Those questions could (and did) change the deductibility of the hypothetical customer's cellphone business expense. Gimenez reported those items on the organizer and return as business expenses, and then directed the customer to sign those documents certifying their truth and accuracy. After willfully failing to ask the right questions (and thus elicit accurate and complete information), he certified that he had no information that appeared to be incorrect, incomplete, or inconsistent. Gimenez now has a signature, under penalty of perjury, that he incorrectly asserts absolves him of liability for reporting a fraudulent item on the customer's tax return. But, Gimenez tailored his questions to keep himself safe.

20.     In finding that Gimenez willfully violated the Injunction, the Court is not stripping the customers' signatures of their force, but it is emphasizing only that customers' signatures under these circumstances do not absolve Gimenez of his statutory, regulatory, and injunctive duties as tax return preparers. Indeed, the customers who signed the returns prepared by Gimenez did so based on their belief that he followed the law.

21.     Furthermore, to the extent there might be a question about the impact of the signatures of Gimenez's clients, the Undersigned is applying an adverse inference against Gimenez because of his consistent failure to answer substantive questions by asserting his Fifth Amendment privilege against self-incrimination. My rationale for doing so is already on record [ECF No. 110 ("Order on Potential Adverse Inferences")], so I will not repeat it here.

22.     Because Gimenez asserted the Fifth Amendment and deprived the United States of the opportunity to ask him questions about the declaration [ECF No. 72-1] he filed in opposition to the United States' Motion for a Show Cause Order, the Undersigned is not considering Gimenez's declaration. *United States v. Two Parcels Property Located at 2730 Highway 31 Jemison, Chilton County, Ala.*, 909 F. Supp. 1450, 1456-57 (M.D. Ala. 1995) (court will not consider an affidavit in its summary judgment analysis because the affiant invoked his Fifth Amendment privilege and refused to answer Government's deposition questions). "A party who asserts the privilege may not 'convert [it] from the shield against compulsory self-incrimination which it was intended to be into a sword[.]'" *Arango v. U.S. Dept. of the Treasury*, 115 F.3d 922, 926 (11th Cir. 1997) (quoting *United States v. Rylander*, 460 U.S. 752, 758–59 (1983)); *Pedrina v. Chun*, 906 F. Supp. 1377, 1398 (D. Hawaii 1995), aff'd. 97 F.3d 1296 (9th Cir. 1996) ("The [d]efendants may not rely on their own testimony or affidavits to support their version of a disputed issue where they have

41

asserted their Fifth Amendment right not to answer questions concerning that very same issue."( citation omitted)); *cf. Sec. & Exch. Comm'n v. Calmes, No. 09-80524,* 2010 WL 11505260, at *4 (S.D. Fla. Nov. 19, 2010) (unduly prejudicial to SEC to allow the defendant to offer testimony on issues for which he refused to provide information).

### *Gimenez fabricated COVID-related credits on the*<br>*tax returns of Yunier Cabrera and Ana Teresa Milanes-Baez*

23.     The Government proved by clear and convincing evidence that Gimenez violated the Injunction when he claimed COVID-related credits on the 2021 tax returns of Cabrera and Milanes.

24.     For tax year 2021, certain small businesses and self-employed individuals were eligible to claim a credit for paid sick or family leave due to COVID-19. *See* Internal Revenue Service, COVID-19-Related Tax Credits for Paid Leave Provided by Small and Midsize Businesses FAQs. The credit was available to employers who paid sick or family leave to an employee who missed work because he or she had to quarantine, care for a family member with COVID-19, care for a child during COVID-related school closures, or experienced COVID-19 symptoms. *Id.* A self-employed individual is entitled to the credit for those same reasons. *Id.*

24.     Gimenez included this COVID credit on Cabrera's and Milanes's 2021 tax returns even though they told Gimenez that they never missed work because of COVID.

25.     As discussed below, Gimenez also improperly deducted car mileage as a business expense for Cabrera's and Milanes's commutes to work. These commuting expenses represented that they drove to work all five days a workweek for all 52 weeks of 2021. It is impossible for Cabrera and Milanes to have missed two weeks of work with COVID but also driven to work five days a week every week of the year. Even if the commuting expenses were properly deductible (which the Undersigned finds they were not), Gimenez was required to resolve this inconsistent reporting on their returns.

26.     Gimenez fabricated the COVID-related credits on Forms 7202 of their returns, thereby wrongfully reducing their tax liabilities or inflating their refunds.

27.     The Government proved by clear and convincing evidence that Gimenez, by claiming the COVID credit:

   a.     understated Cabrera's and Milanes's tax liabilities based on an unreasonable position with no substantial authority and willfully ignored information furnished to him in violation of 26 U.S.C. § 6694 and 26 C.F.R. § 1-6694.1 and therefore violated paragraph I.a of the Injunction;

   b.     aided or assisted Cabrera and Milanes with the intent to understate liability and assert a frivolous position in violation of paragraph I.b of the Injunction;

   c.     assisted Cabrera and Milanes with the intent to claim an improper refund in violation of paragraph I.c of the Injunction;

   d.     prepared returns that claimed a false credit in violation of paragraph I.f of the Injunction; and

e.   engaged in conduct that substantially interfered with the proper administration and enforcement of the internal revenue laws in violation of paragraph I.g of the Injunction.

*Gimenez improperly deducted two*
*non-cash charitable donations on the tax return of Ayleen Garcia*

28.   The Government proved by clear and convincing evidence that Gimenez violated the Injunction when he falsely deducted Garcia's non-cash donations to the Vietnam Veterans charity on her 2021 tax return.

29.   The Injunction requires non-cash charitable donations that exceed $500 to be supported with "a detailed listing of each and every item donated, the date of such donation, and that item's value as estimated by the taxpayer or the charity." [ECF No. 44 ¶ II.d.iv.].

30.   The Court does not need to examine whether the receipts meet those requirements because they reflect donation dates in 2022 and therefore cannot be claimed in tax year 2021. Thus, Gimenez knew or should have known based on a glance at the receipt that he could not deduct the donations on Garcia's return.

31.   Even if they were dated in 2021, the receipts do not detail "each and every item donated" and do not include the values of those items.

32.   Instead of asking Garcia for clarification, Gimenez ignored information furnished to him and improperly deducted a $1,400 non-cash donation to the Vietnam

Veterans charity on Schedule A of Garcia's return, thereby improperly reducing her tax liability or inflating her refund.

33.    The Government proved by clear and convincing evidence that Gimenez, by deducting the charitable donation:

a.    understated Garcia's tax liabilities based on an unreasonable position with no substantial authority and willfully ignored information furnished to him in violation of 26 U.S.C. § 6694 and 26 C.F.R. § 1-6694.1 and therefore violated paragraph I.a of the Injunction;

b.    aided or assisted Garcia with the intent to understate her liability and assert a frivolous position in violation of paragraph I.b of the Injunction;

c.    assisted Garcia with the intent to claim an improper refund in violation of paragraph I.c of the Injunction;

d.    prepared a return that claimed a false deduction in violation of paragraph I.f of the Injunction;

e.    prepared a Schedule A without verifiable information that the donation was made and may be deducted in violation of paragraph II.d of the Injunction;

f.    failed to make reasonable inquiries where information furnished to him to prepare the return appeared incorrect or incomplete and ignored such information in violation of paragraphs I, II, IV of the Injunction; and

g.    engaged in conduct that substantially interfered with the proper administration and enforcement of the internal revenue laws in violation of paragraph I.g of the Injunction.

***Gimenez improperly deducted commuting expenses on
the tax returns of Yunier Cabrera and Ana Teresa Milanes-Baez***

34.    The Government proved by clear and convincing evidence that Gimenez violated the Injunction when he falsely deducted commuting expenses on the 2021 tax returns of Cabrera and Milanes.

35.    A "taxpayer's cost of commuting to his place of business or employment are personal expenses and do not qualify as deductible expenses" unless the taxpayer's home is their principal place of business. 26 C.F.R. § 1.262-1(b)(5); INTERNAL REVENUE SERVICE, Publication 463, *Transportation*, at 13 (2021). Whether a taxpayer's home qualifies as a principal place of business depends on several factors like (1) the relative importance of the activities performed at each place where he conducts business, and (2) the amount of time spent at each place where he conducts business. INTERNAL REVENUE SERVICE, Publication 587, Principal Place of Business, at 3 (2021). A taxpayer's status as an independent contractor is not determinative of whether their home is their principal place of business.

36.    Cabrera told Gimenez that he drives his car only to commute from his home to a single work location. Gimenez nevertheless deducted his commuting expenses. *Id*.

37.    On Milanes's return, he deducted driving expenses for drives that did not correspond to her actual travel.

38.     Because Cabrera's home is not his principal place of business, his drive to work was a commute and does not qualify as a deductible expense. Taking the position that the related expenses were deductible was an unreasonable position that Gimenez knew or should have known was unreasonable.

39.     The Government proved by clear and convincing evidence that Gimenez, by deducting these commuting expenses:

a.      understated Cabrera's and Milaness's tax liabilities based on an unreasonable position with no substantial authority and willfully ignored information furnished to him in violation of 26 U.S.C. § 6694 and 26 C.F.R. § 1-6694.1 and therefore violated paragraph I.a. of the Injunction;

b.      aided or assisted Cabrera and Milanes with the intent to understate their liability and assert a frivolous position in violation of paragraph I.b of the Injunction;

c.      assisted Cabrera and Milanes with the intent to claim an improper refund in violation of paragraph I.c of the Injunction;

d.      prepared returns that claimed a false deduction in violation of paragraph I.f of the Injunction;

e.      engaged in conduct that substantially interfered with the proper administration and enforcement of the internal revenue laws in violation of paragraph I.g of the Injunction; and

f.      prepared Schedules C that included non-deductible commuter expenses and other travel expenses that he knew to be based on inaccurate information in violation of paragraphs II.b.iv–v of the Injunction.

*Gimenez improperly deducted business expenses on*
*the tax returns of Yunier Cabrera and Ana Teresa Milanes-Baez*

40.     The Government proved by clear and convincing evidence that Gimenez

violated the Injunction when he falsely deducted multiple business expenses on the 2021

tax returns of Cabrera and Milanes.

41.     Taxpayers can report on their tax returns income or losses from a business

they operate or a profession they practice as a sole proprietor. *See* INTERNAL REVENUE

SERVICE, 2021 Instructions for Schedule C. And they can deduct costs of carrying on their

trade or business, also known as business expenses. *See* INTERNAL REVENUE SERVICE, Pub.

535, Business Expenses, at 3. But taxpayers cannot deduct personal, living, or family

expenses unless they divide the total cost between business and personal use and deduct

only the business portion. *See id.* at 5.

42.     To ensure that Defendants properly prepared Schedules C for their

customers, the Injunction required them to collect from each customer information on a

customer organizer and documentation that substantiated the reported business-related

deductions. [ECF No. 44, ¶¶ II.b.i., iv.–v.]. Without that information and substantiation,

Defendants cannot prepare or file a Schedule C on behalf of the customer. [ECF No. 44, ¶

II.b.i.].

43.     Even though he knew that Cabrera's phone bill was not entirely a business expense, Gimenez included the full amount as a business expense, which he was not entitled to do.

44.     Gimenez also included expenses for taxes, licenses, uniforms, and shoes without reviewing documents provided to him. Had Gimenez reviewed those documents, he would have learned that there was no justification for the items and amounts reported on Cabrera's Schedule C.

45.     Gimenez deducted Milanes's entire cellphone plan, the cost of her new phone, the cost of her desktop computer, and the cost of her internet plan without determining whether the entire amount was deductible as a business expense. As demonstrated by the Government's examination of Milanes, simple follow-up questions about those expenses show that they are not deductible.

46.     Gimenez also deducted clothing expenses on Milanes's return, even though they were not solely used for work. This deduction is not allowed. *Yeomans v. Comm'r*, 30 T.C. 757, 768–69 (1958).

47.     Gimenez deducted $295 of business-related legal and professional services expenses for Milanes that he never discussed with her and for which he did not have supporting documentation.

48.     Gimenez never reviewed the bank statements provided for him that did not support the expenses, including those for licenses and supervision. Had Gimenez reviewed those documents instead of ignoring them, he would have learned that there was no justification for the items and amounts reported on Milanes's Schedule C. But he made no effort to do so.

49.     The Government proved by clear and convincing evidence that Gimenez, by deducting these business expenses:

a.     understated Cabrera's and Milanes's tax liabilities based on an unreasonable position with no substantial authority and willfully ignored information furnished to him in violation of 26 U.S.C. § 6694 and 26 C.F.R. § 1-6694.1 and therefore violated paragraph I.a. of the Injunction;

b.     aided or assisted Cabrera and Milanes with the intent to understate their liability and assert a frivolous position in violation of paragraph I.b of the Injunction;

c.     assisted Cabrera and Milanes with the intent to claim an improper refund in violation of paragraph I.c of the Injunction;

d.     prepared returns that claimed a false deduction in violation of paragraph I.f of the Injunction;

e.     engaged in conduct that substantially interfered with the proper administration and enforcement of the internal revenue laws in violation of paragraph I.g of the Injunction

f.     failed to make reasonable inquiries where information furnished to him to prepare the return appeared incorrect or

incomplete and ignored such information in violation of paragraphs I, II, IV of the Injunction; and

g.      prepared Schedules C that included non-deductible business expenses and business expenses that were not supported by proper documentation in violation of paragraphs II.b.i and II.b.iv of the Injunction.

### Gimenez improperly claimed Head of Household statuses on the 2021 tax returns of Ayleen Garcia and Nathaly Hernandez

50.      Gimenez violated the Injunction when he falsified Garcia's and Hernandez's Head of Household filing statuses.

51.      To prepare a return claiming Head of Household filing status, Defendants must verify through the taxpayer that, among other things, the taxpayer is unmarried as discussed in 26 U.S.C. § 2. *See* [ECF No. 44, ¶¶ II.c.i.–iii.].

52.      Ayleen Garcia does not qualify for Head of Household filing status because she was married and lived with her husband in 2021. Her filing status should have either been married filing jointly, or married filing separately.

53.      Gimenez knew or should have known that Garcia was married. She attended the appointment with her husband. Gimenez was provided with, and required to review, numerous documents indicating that Garcia was married to Rolando Perez. At the very least, Gimenez should have recognized that the information provided in the customer organizer and supporting documents was incorrect, incomplete, or inconsistent.

54.     Nathaly Hernandez also does not qualify for Head of Household filing status because she was married and lived with her husband in 2021. Her filing status should have either been married filing jointly, or married filing separately.

55.     Gimenez knew or should have known she was married but he willfully ignored that information furnished to him. She attended the appointment with her husband. In blatant disregard for the law, he destroyed information in her organizer with her husband's information and instructed her so she could file as Head of Household. But he was unable to destroy all evidence of his misdeeds as the documents that survived give an indication that Ms. Hernandez is married.

56.     The Government proved by clear and convincing evidence that Gimenez, by filing Garcia's and Ms. Hernandez's returns as Head of Household:

    a.     understated Garcia's and Ms. Hernandez's tax liabilities based on an unreasonable position with no substantial authority and willfully ignored information furnished to him in violation of 26 U.S.C. § 6694 and 26 C.F.R. § 1-6694.1 and therefore violated paragraph I.a of the Injunction;

    b.     aided or assisted them with the intent to understate their liabilities and assert an unreasonable, frivolous, or reckless position in violation of paragraph I.b of the Injunction;

    c.     assisted them with the intent to claim an improper refund in violation of paragraph I.c of the Injunction;

    d.     failed to make reasonable inquiries where information furnished to him to prepare the return appeared incorrect or

incomplete and ignored such information in violation of paragraphs I, II, IV of the Injunction; and

e.      engaged in conduct that substantially interfered with the proper administration and enforcement of the internal revenue laws in violation of paragraph I.g of the Injunction.

### *The United States Did Not Meet Its Burden Concerning Hernandez's Preparation of the Ackermans' Return*

In the context of tax return preparer injunctions, a "tax return preparer acts willfully 'if the preparer disregards, in an attempt wrongfully to reduce the tax liability of the taxpayer, information furnished by the taxpayer or other persons" or "recklessly or intentionally" disregarding an IRS rule or regulation by "tak[ing] a position on the return or claim for refund that is contrary to a rule or regulation . . . and the preparer knows of, or is reckless in not knowing of, the rule or regulation in question." *United States v. Stinson*, 239 F. Supp. 3d 1299, 1319 (M.D. Fla. 2017) (quoting *United States v. Elsass*, 978 F. Supp. 2d 901, 918 (S.D. Ohio 2013)).

Under federal law in 2021, a taxpayer could claim his or her parent as a dependent (or, "qualifying relative dependent") if, inter alia, the parent had a gross income of less than $4,400 (excluding social security benefits) and the taxpayer provided more than half

of the parent's total support for the year. *See* 26 U.S.C. § 152(d)(1); IRS Publication 501 (2022), Table 2.[5]

In response to the Undersigned's questioning during the evidentiary hearing, the United States acknowledged that it did not present any dollar amounts for the support provided to Mr. Weiss by the Ackermans. [May 26 Hr'g Tr. 135]. In the absence of these numbers, the United States has failed to carry its burden of proving by clear and convincing evidence that Mr. Weiss did not qualify as the Ackermans' dependent. *See, Diamond Resorts Int'l Inc.*, 2021 WL 9596129, at *2. To the contrary, because Mrs. Ackerman testified that Mr. Weiss had no income other than social security and no other sources of support, it appears that Mr. Weiss *did* qualify as the Ackermans' dependent, although that finding is secondary to the finding that the United States has not proved its contempt charge on this point.

Regardless of the Government's failure to carry that first burden, the Government argues that Mr. Hernandez is nevertheless in contempt for his failure to conduct an adequate due diligence regarding Mr. Weiss's status as a dependent on the Ackermans' tax return. [May 26 Hr'g Tr. 135-138]. According to the United States, "[w]hen you have an injunction that requires due diligence from the defendants . . .the failure to do that due

---

[5]     Available at: https://www.irs.gov/publications/p501#en_US_2022_ publink1000220702 (last visited 8/10/2023).

diligence . . .does constitute a violation, even if in some cases the defendants may be correct." [May 26 Hr'g Tr. 138].

The Undersigned is unaware of any case law supporting the Government's theory. Nevertheless, even if a *correct* deduction supported by an *insufficient due diligence* could somehow support a finding of a return preparer's contempt, the Government has failed to carry its burden of proving its case by clear and convincing evidence. Primarily, the Government overstates the due diligence required of Hernandez and understates the significance of the organizer.

Regarding qualifying dependents, the Injunction simply requires that Hernandez's clients complete and sign the stipulated organizer and allows dependent deductions to be claimed where "the requirements for eligibility . . . are confirmed by the taxpayer[.]" [ECF No. 44, ¶ II.e.]. There is no question that this occurred here: the Ackermans' organizer is in evidence and it clearly shows that the Ackermans "confirmed" Mr. Weiss's eligibility. [ECF No. 103-37].

Here, it is also worth noting that Hernandez had prepared the Ackermans' return for the prior "10 or 11 years," and the Ackermans had claimed Mr. Weiss as a dependent throughout that time. When asked about whether she and Mr. Hernandez discussed Mr. Weiss's status as a dependent when they met to prepare the 2021 return, Mrs. Ackerman testified that it was "assumed" he is a dependent:

> By Mr. Burrell: Did you talk about having Mr. Weiss as a dependent every year with Mr. Hernandez?
>
> By Mrs. Ackerman: The first year. I think it was almost assumed. I mean, it was on there and he was still alive and we were still doing the same that we were doing when we first had him on the taxes.

[May 25 Hr'g Tr. 140: 19-23].

The United States also argues that Hernandez had due diligence obligations beyond the plain terms of the Injunction itself. Indeed, when filing the Ackermans' 2021 Form 1040, Hernandez completed IRS Form 8867, the "Paid Preparer's Due Diligence Checklist," and confirmed that the information provided by the Ackermans was not "incorrect, incomplete, or inconsistent." [ECF No. 103-35]. The United States therefore argues that Hernandez falsely completed the Due Diligence Checklist because, as described above, the Ackermans wrote "100%" once in the center of the column to the right of their list of three dependents, rather than next to each of the three listed names.

However, even if this could amount to contempt, given the likelihood that Mr. Weiss was, in fact, a qualifying dependent,[6] the Government has failed to carry its burden of proof. Indeed, Hernandez testified that he has been a return preparer for more than twenty years, and, since that time, between 75% and 85% of his clients have claimed

---

[6]    *See, e.g., Doe 1 v. Francis*, No. 5:03CV260/RS, 2006 WL 8444030, *6 (N.D. Fla. May 8, 2006) ("[T]his Court refuses to exercise its contempt powers solely for the sake of exercising them on what amounts to, at most, an inadvertent and trivial violation of an unwritten and ambiguous court order that did not prejudice Defendants.").

dependents on their tax returns. [May 26 Hr'g Tr. 68]. He also testified that, in his experience, it is "very normal" for taxpayers to claim "87- or 88-year-old parents who [do not] work" as their dependents. *Id*.

Additionally, when questioned by the Government about why the Ackermans wrote "100%" only once -- rather than three times -- next to their list of dependents, Hernandez testified that he "assumed that they belonged to all three, because they're written in the middle." [May 26 Hr'g Tr. 114]; *see also*, [May 26 Hr'g Tr. 112 ("I took that 100 percent to mean for all three."), 68].

Hernandez's testimony on this point was uncontested. For its part, other than asking Hernandez multiple times about the "100%" issue and addressing it at closing, the United States has failed to rebut Hernandez's reasonable understanding of the Ackermans' organizer. For instance, the United States did not present expert testimony on this issue, which leaves the Court with no basis to doubt how Hernandez prepared the 1040 or completed the Due Diligence Checklist. Thus, if Hernandez departed from the standard employed by other return preparers, the Government has failed to carry its burden of proving it (and that the departure was a willful violation) by clear and convincing evidence.

*Hernandez did not violate the injunction by failing to supervise Gimenez*

The Government alleged that Gimenez violated the Injunction based on his preparation and filing of four clients' tax returns. However, it was also undisputed at the evidentiary hearing that Hernandez had *no involvement* with the preparation of Gimenez's clients' tax returns, and that he neither directed nor controlled Gimenez in any meaningful way concerning the preparation of the returns. [May 26 Hr'g Tr. 80]. Based on this record, the Court cannot find Hernandez in contempt for the Gimenez-prepared tax returns.

However, the Government argues that because Hernandez had the authority to hire, train, fire and pay Gimenez and the other FHTS return preparers, he therefore had the affirmative obligation to supervise them, and, by failing to supervise Gimenez, he willfully violated the Injunction. [May 26 Hr'g Tr. 132]. The Undersigned disagrees with the Government's position because it is disconnected from the plain terms of the Injunction.

The Consent Injunction provides, in Section V, that Hernandez "shall take appropriate remedial measures" "**if**, following the exercise of reasonable diligence," he "learns that any employee, independent contractor, agent or other person operating under [his] supervision or control is preparing returns in violation of this Injunction."

[ECF No. 44, ¶ V (emphasis added)]. The paragraph then pinpoints the specific remedial measures which must be taken **if** Hernandez acquires the requisite knowledge.

It is the precondition, the "if," which is missing from the United States' theory. There is no record evidence that Hernandez learned that Gimenez was violating the injunction. Absent that threshold condition, there are no remedial measures required.

Likewise, Section VI of the Consent Injunction provides that "the actions of Gimenez and any entity owned or operated by Gimenez or other person acting in concert and/or participation with Gimenez shall **not** be considered actions affecting Hernandez, for purposes of this Injunction, **if [ ] Defendants decide to prepare tax returns independently from one another**." *Id.* (emphasis added). Given that Hernandez and Gimenez prepared the returns independently from each other, Gimenez's actions are not considered actions affecting Hernandez.

Similarly, the same paragraph provides that "to the extent a person (an independent contractor, employee, or agent) no longer acts in concert and/or participation with Defendants, the actions of that person shall not be considered actions affecting Defendants for purposes of this Injunction." *Id.* There is no evidence that Hernandez was acting "in concert" with Gimenez in connection with Gimenez's preparation of tax returns, as an independent contractor, for his clients.

Framed by the language quoted above from the Order, it appears as though the United States' theory is based on a novel reading of language which appears nowhere in the text. Indeed, the theory seems to ignore the very provisions which *permit* Hernandez and Gimenez to prepare tax returns independently from each other without worrying about being saddled with consequences arising from the other's misconduct (unless they had knowledge of a violation committed by the other).

There are two categories of cases where a defendant can properly be held in contempt of a court order based on a failure to prevent certain actions of third parties. First, to provide one illustration, in *Tegal Corp. v. Tokyo Electron Co. Ltd.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001), the court explained that if an order contains an "affirmative obligation" to take (or not take) a particular action, the court may make a finding of contempt even if the alleged contemnor's compliance depended on the action (or inaction) of third parties. *Id.* In making this point, the court discussed *Consolidation Coal Co. v. United Mineworkers*, 683 F.2d 827 (4th Cir. 1982):

> In [*Consolidation Coal Co.*] the court found a local union and its officials in contempt of court for failing to take reasonable efforts to persuade miners to return to work, including failing to threaten or take disciplinary action against union members. The basis for that ruling, however, was that the temporary restraining order at issue specifically enjoined the union and its officials from "[e]ngaging in or continuing to engage in, supporting or encouraging, reinstituting, by *failing to take reasonable steps to end, or otherwise, the current strike or work stoppage*[.]"

*Id*. (emphasis in original); *see also In re Dolcin Corp*., 247 F.2d 524, 534 (D.C. Cir. 1956) (finding two company officials in contempt "for inaction" because a prior order had imposed "an **affirmative** obligation on them . . . to take all reasonable steps to effect compliance with [the] court's order." (emphasis added)).

The *Tegal* Court reversed an Order holding the defendant and its parent corporation in contempt for continuing to service infringing etchers, in violation of the injunction, because, absent evidence that the defendant took some affirmative action to "facilitate" its parent company's action, the defendant was not in contempt of the injunction. In the instant case, of course, there is no evidence that Hernandez facilitate Gimenez's violation of the Consent Injunction.

Second, "[i]n the absence of express obligations to prevent particular conduct by others, courts have held parties in contempt based on the conduct of others, but . . . have required proof that the party subject to contempt sanctions had **control** over those who engaged in the conduct proscribed by the injunction." *Tegal Corp.*, 248 F.3d at 1379 (citing *United States v. Johnson*, 541 F.2d 710, 712-713 (8th Cir. 1976) (company CEO held in contempt for "permitting corporate salesmen to repeatedly violate an injunction prohibiting [CEO] and the corporation from engaging in certain unfair trade practices," and where CEO "exercised a **high degree of control** over the actual wrongdoers") (emphasis added)); *see also FTC v. Leshin,* 618 F.3d 1221, 1235-36 (11th Cir. 2010) ("[The]

defendants may not nullify [the injunction] by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." (internal citation omitted)).

Neither factor is present in this case. This case is not in line with the first category of cases discussed above because there were no "affirmative obligations" in the Injunction which Hernandez did not satisfy. The Injunction's affirmative obligations are set forth in paragraphs II and III, which detail the steps "Defendants – and any entity they own or operate, and their employees, independent contractors, and agents" must take when preparing tax returns for others, including by requiring their customers to complete Customer Information Organizers and then maintaining copies in each respective customer's file. [ECF No. 44, ¶¶ I-II]. There are no allegations that Hernandez failed to comply with these affirmative obligations for the returns prepared by Gimenez.

Additionally, the Undersigned does not infer an affirmative obligation for Hernandez to supervise Gimenez from paragraph V of the Injunction, which provides the "appropriate measures" Defendants should take "**if** [they] learn" that someone "under their supervision or control is preparing returns in violation of this Injunction[.]" (emphasis supplied). The Injunction conditions these "appropriate measures" on "Defendants" learning that someone "under their supervision or control" has violated

the Injunction, but, as noted above, there is nothing in the record to support a finding that any such discovery ever occurred here.

Furthermore, given the specificity of the rest of the Injunction, the supervisory obligation called for by the Government should be similarly specific. However, the Injunction is silent about what that supposed supervisory obligation would entail, and thus Hernandez had no notice about this purported obligation, much less how to satisfy it. Under these circumstances, it would be inappropriate for the Court to read an affirmative supervisory obligation into the Injunction, particularly given the importance of "specificity" in the case law. *See, e.g., NBA Props. Gold*, 895 F.2d 30, 32 (1st Cir. 1990); quoting *Schmid v. Lessard*, 414 U.S.473, 476 (1974) (specificity requirements are not "merely technical" but are "designed to prevent uncertainty and confusion . . . and to avoid" basing a "contempt citation on a decree too vague to be understood").

At best, the Government's interpretation hinges on an ambiguity, but courts must construe ambiguities "in favor of the party charged with contempt." *Peery*, 977 F.3d at 1077; *see also Schmidt*, 414 U.S. at 476 ("[S]ince an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.").

Finally, as previously described, Hernandez's testimony that he neither supervised nor controlled Gimenez is uncontradicted. It is also uncontroverted that

Hernandez and Gimenez did not work on each other's clients' tax returns. [May 26 Hr'g Tr. 100]. This case is therefore distinguishable from the second category of cases described above, i.e., where the defendants engaged in contemptuous conduct through the third parties they controlled. *See, e.g., Johnson*, 541 F.2d 710, 712-713. There is simply no evidence that Hernandez either controlled or directed the actions of Gimenez when he prepared tax returns for clients. In the absence of such evidence the Government has failed to carry its burden of proving by clear and convincing evidence that Hernandez violated the Injunction by failing to adequately supervise Gimenez.

The Undersigned recommends that the Court **not** hold Hernandez in contempt based on his alleged failure to supervise Gimenez, an independent contractor -- a purported duty not explicitly mentioned in the Consent Injunction. Phrased differently, the United States' approach here -- seeking to hold Hernandez in contempt for Gimenez's violations as an independent contractor -- is not based on a "clear and unambiguous" provision in the Consent Injunction. *Riccard,* 307 F.3d at 1296.

## III.    Conclusion

The Undersigned respectfully **recommends** that Chief Judge Altonaga find Gimenez in contempt but not find Hernandez in contempt.

IV.     **Objections**

The parties will have fourteen (14) days from the date of being served with a copy

of this Report and Recommendations within which to file written objections, if any, with

the District Judge. Each party may file a response to the other party's objection within

fourteen (14) days of the objection. Failure to file objections timely shall bar the parties

from a *de novo* determination by the District Judge of an issue covered in the Report and

shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions

contained in the Report except upon grounds of plain error if necessary in the interests

of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v.*

*Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on August

10, 2023.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Cecilia M. Altonaga
All Counsel of Record